IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | | |
|---|---|---|
| JAY H. PETERSON, | ) | Civil No.  2:04-CV-962BSJ |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| vs. | ) | **& ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |
| | ) | |

```
┌─────────────────────────────────┐
│              FILED               │
│  CLERK, U.S. DISTRICT COURT      │
│     May 2, 2006 (10:42am)        │
│       DISTRICT OF UTAH           │
└─────────────────────────────────┘
```

* * * * * * * * *

Plaintiff Jay H. Peterson commenced this action under 26 U.S.C. § 7422, seeking a

"refund of overpaid Federal income taxes," and invoking this court's jurisdiction pursuant to 28

U.S.C. § 1346(a)(1).  (Complaint, filed October 15, 2004 (dkt. no. 1), at 2 ¶¶ 3-4.)   The United

States filed an Answer (dkt. no. 2), and the parties subsequently filed cross-motions for summary

judgment.  (*See* United States' Motion for Summary Judgment, filed November 30, 2005 (dkt.

no. 15), accompanying memorandum in support (dkt. no. 16), and Affidavit (dkt. no. 17);

"Motion for Summary Judgement," filed December 15, 2005 (dkt. no. 19), and accompanying

memorandum, declaration and exhibits in support.)  Memoranda in response and reply were

filed, and the matter came before the court for hearing on February 23, 2006.  At the hearing,

plaintiff Peterson appeared *pro se* and Virginia Cronan Lowe appeared on behalf of the United

States.

Having reviewed and considered the motions and memoranda submitted by the parties

and having heard and considered the arguments presented by the parties at the February 23rd

hearing, the court made a bench ruling granting the United States' motion for summary judgment and denying Peterson's motion.  (*See* Minute Entry, dated February 23, 2006 (dkt. no. 28).)  Counsel for the United States was directed to prepare and submit a proposed form of order reflecting the bench ruling, which she did on March 20, 2006.  Peterson filed no objection to the proposed form of order.

On March 21, 2006, Peterson filed a "Motion to Recuse Judge Bruce S. Jenkins" (dkt. no. 29), accompanied by a Certificate of Good Faith and an Affidavit.  That motion is the subject of a separate Memorandum Opinion & Order re: Recusal, filed May 1, 2006 (dkt. no. 30).

## THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

The United States submits that it is entitled to judgment as a matter of law denying Peterson's refund claim in this proceeding, based upon the preclusive effect of the express terms of a settlement agreement previously approved by order of the court in a prior proceeding.

### Factual Background

For purposes of the United States' motion for summary judgment, the following material facts appear to exist without substantial controversy or genuine dispute:[1]

1.    On or about May 6, 1993, the Federal Trade Commission ("FTC") filed a

---

[1]These facts were substantially set forth in the "Statement of Facts" of the Memorandum in Support of United States' Motion for Summary Judgment," at pages 2-4 ¶¶ 1-11, in the form and with the content required by the court's Local Rule, DUCivR 56-1(b).  Under our Local Rule, "[a]ll material facts of record meeting the requirements of Fed. R. Civ. P. 56 that are set forth with particularity in the statement of the movant will be deemed admitted for the purpose of summary judgment, unless specifically controverted by the statement of the opposing party identifying material facts of record meeting the requirements of Fed. R. Civ. P. 56."  DUCivR 56-1(c).  Peterson's "Memorandum of Taxpayer Opposed to IRS Motion for Summary Judgment," filed January 30, 2006 (dkt. no. 25), included no "statement of material facts as to which the party contends a genuine issue exists," as required by DUCivR 56-1(c) if Peterson was to controvert the facts set forth in the Government's memorandum.  His "Reply by Taxpayer to Response of IRS re Cross Motions for Summary Judgment," filed February 22, 2006 (dkt. no. 27), includes a section headed "Disputed Facts," but it largely reiterates Peterson's legal arguments and does not comply with DUCivR 56-1(c).

The facts set forth by the United States' "Statement of Facts" are thus deemed admitted for the purpose of the United States' summary judgment motion.  Additional factual allegations set forth herein were extracted from Peterson's Complaint or the Settlement Agreement, as indicated.

complaint against Jay Peterson, and certain subchapter S corporations owned by Mr. Peterson,

commencing *Federal Trade Commission v. U.S. Hotline, Inc., et al.*, Civil No. 2:93-CV-444B

(D. Utah), and alleging violations of the Federal Trade Commission Act, 15 U.S.C. §§ 5 *et seq.*

On or about May 11, 1993, the FTC obtained a "Temporary Restraining Order with Asset Freeze

and Temporary Receiver, Order Allowing Immediate Access to Defendant's Premises, Order

Permitting Expedited Discovery, and Order to Show Cause Why a Preliminary Injunction Should

Not Issue and Why a Permanent Receiver Should Not be Appointed," (dkt. no. 15), signed by

Judge Aldon J. Anderson after an *ex parte* hearing.  (*See* Minute Entry, dated May 11, 1993 (dkt.

no. 14).)

      2.      On June 15, 1993, the court entered an "Order for Preliminary Injunction With

Asset Freeze, Appointment of a Receiver, and Other Relief" (dkt. no. 45), based upon a

stipulation between the FTC and the defendants.  The June 15th Order designated a court-

appointed Receiver to serve in the pending FTC litigation.

      3.      The Receiver collected more than $5 million in assets from the defendants, which

was subject to administration in the pending FTC litigation for the benefit of consumers and

other parties with claims against the receivership estate.

      4.      Thereafter, on or about December 7, 1993, Jay Peterson filed a petition for relief

under Chapter 11 of the Bankruptcy Code, *In re Jay Peterson*, Bankr. No. 93B-26457 (Bankr. D.

Utah), and on or about March 4, 1994, his subchapter S corporations filed Chapter 11 bankruptcy

petitions; and as debtors-in-possession, Peterson and his corporations sought to regain control of

the receivership assets.

      5.      By Order, filed May 5, 1994 (dkt. no. 250), Judge Benson stayed the corporate

entities' bankruptcy proceedings, retained exclusive district court jurisdiction over the funds, assets and property held by the Receiver and denied automatic reference to the bankruptcy court of the matters pending before the district court in the FTC action.

6.      On or about April 28, 1995, Peterson, his corporate entities, the FTC, the Internal Revenue Service, the Utah State Tax Commission and the court-appointed Receiver entered into a written Settlement Agreement relating to the administration of the receivership estate.[2]  The Settlement Agreement was signed by all parties, including Peterson individually, as an officer or agent of any or all of the corporate defendants, and Peterson's attorney.  Peterson also initialed each page of the Settlement Agreement.

7.      On or about August 29, 1995, pursuant to the joint motion of the parties (dkt. no. 408), the court entered an "Order Authorizing and Approving Settlement Agreement," (dkt. no. 409), in *Federal Trade Commission v. U.S. Hotline, Inc., et al.*, Civil No. 2:93-CV-444B (D. Utah), authorizing the Receiver to "proceed with the administration of the *Settlement Agreement* in accordance with its terms," and adopting the Settlement Agreement "as the order of this Court."  (*Id.* at 5 ¶¶ 2, 5.)

8.      The Settlement Agreement addressed "all assets held by the Receiver, including but not limited to the approximately $5,250,000 held in cash, the Kaleidoscope Home and all remaining personal property under the control of the Receiver."  (Settlement Agreement at 4 ¶ 2.)

9.      It deemed the corporate entities and another individual "to be the alter egos

---

[2]Copies of the Settlement Agreement are annexed as Exhibit B to Peterson's Memorandum in Support of Motion for Summary Judgement, filed December 15, 2005 (dkt. no. 19), and as part of Exhibit 1 to the Declaration of Virginia Cronan Lowe, filed November 30, 2005 (dkt. no. 17).   The Settlement Agreement is also annexed as Exhibit A to the Order Authorizing and Approving Settlement Agreement, filed August 29, 1995 (dkt. no. 409), in *Federal Trade Commission v. U.S. Hotline, Inc., et al.*, Civil No. 2:93-CV-444B (D. Utah), and is incorporated in and adopted by that Order.

and/or nominees of Jay Peterson," (*id.* at 5 ¶ 3.1), and "[a]ll federal tax assessments and

liabilities" to be "tax liabilities of Jay Peterson, individually," including specific amounts of tax

liability and/or interest for 1990, 1991, 1992, and "for the year in which the allowed claim under

paragraph 3.3 of this agreement is paid"—referring to the agreed sum of $458,000 to be paid by

the Receiver to the Internal Revenue Service as a "first priority" claim and applied to the tax and

interest liabilities set forth in that paragraph.  (*Id.* at 5-6 ¶¶ 3.2-3.4.)  The Settlement Agreement

provided that payment of the allowed claim of $458,000 "shall be accepted in full satisfaction of

all tax liabilities, plus interest and penalties," owed by Peterson and his entities and nominees

"for all tax years ending 1990, 1991, 1992, and 1993," or arising from the payment of $458,000

to the Internal Revenue Service and $118,879 to the Utah State Tax Commission under the terms

of the Agreement.  (*Id.* at 6 ¶ 3.6.)

        10.     The Settlement Agreement detailed a claim procedure by which customers of the

Peterson entities could obtain refunds paid out of the receivership estate for products purchased

from those entities.  (*Id.* at 10-11 ¶¶ 4-4.3; 15-19 ¶¶ 7-7.7.)  It also provided for allowance and

payment of claims of "non-refund creditors."  (*Id.* at 11-13 ¶¶ 5-5.6.)

        11.     Section 9 of the Settlement Agreement provided for the disposition of any

receivership assets "remaining after the payment in full of all administrative and allowed claims

as set forth in this *Agreement*"; it called for the tax-free abandonment of the "Kaleidoscope

Home" by the Receiver (having an agreed value of $250,000); and it provided for the distribution

to Peterson of "the assets of the Receivership Estate in excess of the value of the Kaleidoscope

Home," subject to "the withholding of taxes by the Receiver."  (*Id.* at 20-21 ¶¶ 9-9.3.)  Paragraph

9.3 ("Taxes on Distributions") specified that "all such Residual Distributions shall be taxable to

Jay Peterson individually."  (*Id.* at 21 ¶ 9.3.)

12.     Paragraph 9.4 provided that "the Receiver shall withhold from any Residual

Distribution to be made to Jay Peterson for the payment of federal and state income taxes an

amount based on the maximum federal and state income tax rates then in effect," paying the

withheld sums directly to the Internal Revenue Service and the Utah State Tax Commission.  (*Id.*

at 21-22 ¶ 9.4.)  "The amount of any Residual Distribution, prior to reduction for the withholding

of taxes pursuant to section 9.4, shall be reported on the returns of the Corporate Defendants and

in turn on returns of Jay Peterson, who retains the rights provided by law to contest his income

tax liability."  (*Id.* at 22 ¶ 9.4.)

13.     In the year 2001, as part of the termination of the receivership and pursuant to the

terms of the Settlement Agreement, the Receiver made a residual distribution to Peterson in the

amount of $768,960.  The Receiver withheld $343,936 from the disbursement of the residual

distribution and paid it to the Internal Revenue Service as required by § 9.4 of the Settlement

Agreement.  The Receiver also withheld $61,524.32 from the residual distribution and paid that

amount to the Utah State Tax Commission pursuant to the same provision of the Settlement

Agreement.

14.     On or about April 15, 2002, Peterson filed a personal income tax return on Form

1040 and a Form 1041 income tax return for his bankruptcy estate, both for the year 2001.  Both

of those returns claimed -0- income and reported and claimed a refund of the $343,936 paid to

the Internal Revenue Service by the Receiver in 2001.[3]  Upon being advised by the Service that

---

[3]Peterson argues that "Taxpayer fully reported the residual distribution in complete detail in the disclosure statement attached to and part of his income tax return for 2001." (Memorandum of Taxpayer Opposed to IRS Motion for

(continued...)

all of his return information for 2001 could not be located, Peterson re-filed both returns with the

Internal Revenue Service on or about October 17, 2003.  (Complaint (dkt. no. 1), at 3 ¶ 6(c) &

Exh. A.)

15.     On or about June 15, 2004, Peterson received a notice of Income Tax

Examination Changes from the Internal Revenue Service concerning his 2001 Form 1040

individual income tax return, reflecting additional income for 2001 of $768,960, a credit of

$343,936—reflecting the Receiver's residual distribution—resulting in a total tax liability of

$285,199, and an estimated overpayment of $58,737.  (*Id.* at 3 ¶ 6(d) & Exh. B.)  Peterson

received an amended notice dated September 1, 2004, reflecting an additional accrual of interest

computed to October 1, 2004 of $37,256.82, and the removal of "the payment previously shown

as federal withholdings," but indicating that the payment "will be applied against any tax you

owe when the case closes."  (*Id.* & Exh C.)

**Peterson's Claims in this Proceeding**

Peterson's Complaint alleges three "facts upon which Plaintiff relies [a]s the basis for its

claim of refund of all the estimated payment of income taxes of $343,936 paid" in 2001: First,

"The payment of funds in the amount of $768,960 in 2001 by the Receiver to Jay H. Peterson and

the Bankruptcy Estate did not constitute taxable income to Plaintiff.  The distribution of the

$768,960 from the Receivership to Mr. Peterson and the Bankruptcy Estate constituted a return

to Plaintiff of his own assets."  (Complaint at 4 ¶ 8(a).)  Second, Peterson asserted that the

residual distribution "was not a distribution of funds for which Plaintiff or the Bankruptcy

_____

[3](...continued)
Summary Judgment," filed January 30, 2006 (dkt. no. 25), at [3].)

Estates had previously taken a deduction against income and received a tax benefit" under the "tax benefit rule and the provisions of 26 U.S.C. §111." (*Id.*)  Third, the United States "is barred from assessing any additional tax liability for 2001 under the provisions of Title 11 U.S.C. § 505 in that the Internal Revenue Service did not notify Petitioner within 60 days of filing of the returns, including the Form 1041 Income Tax Return for the Bankruptcy Estate, that the returns had been selected for examination and in addition, the Internal Revenue Service did not complete an examination of the returns and notify Plaintiff of any tax due within 180 days after the filing of the returns and refund claim, as required by 11 U.S.C. § 505." (*Id.* at 4-5 ¶ 8(b).)

The Complaint alleges parallel "Allegations of Error," asserting that the Receiver's residual distribution to Peterson was not income, but "constituted a return to Plaintiff of his own assets," that "the distribution does not constitute taxable income under the tax benefit rule and the provisions of 26 U.S.C. §111," and that the United States is barred from "assessing any additional tax liability against Plaintiff for 2001 under the provisions of Title 11 U.S.C. § 505 . . . ." (*Id.* at 5 ¶¶ 9(a),(b).)  The Complaint's prayer for relief requests "an adjudication that the distribution of $768,960 by the Receiver to Plaintiff in 2001 does not constitute taxable income to Petitioner," and that the United States "is barred from assessing any income tax liability to Plaintiff arising out of that distribution." (*Id.* at 6 ¶ 1 (Prayer for Relief).)  It seeks judgment against the United States in the amount of $343,936, "together with applicable interest thereon until paid." (*Id.* at ¶ 2.)

### Grounds of the United States' Motion

The United States sought summary judgment on one issue: "Whether the Order Authorizing and Approving Settlement Agreement precludes the instant action." (Memorandum

-8-

in Support of United States' Motion for Summary Judgment, filed November 30, 2005 (dkt. no. 16) ("U.S. Mem."), at 4.)  The United States contends that Peterson's Settlement Agreement, approved and adopted as an order of the district court and approved by the bankruptcy court, "is entitled to *res judicata* effect," precluding Peterson's refund claim on the grounds that he has pleaded in his Complaint:

> [T]he Settlement Agreement signed by the plaintiff and his counsel provided that the distribution of the residual assets of the receivership estate would constitute taxable income to him.  As the Settlement Agreement was approved by this Court and provides for the resolution of this issue, the plaintiff should be precluded from asserting that the distribution is not taxable to him.

*Id.* at 8-9.  Further, the United States argues, "the distribution to the plaintiff of the residual assets from the receivership estate cannot be considered a return of his own assets" because "[t]he receivership estate was created to be able to refund customers that the plaintiff had defrauded," and "was comprised of unclaimed funds."  (*Id.* at 8.)  "The plaintiff was not legally entitled to this money," the Government continues, and had no "basis in the funds because he received the money due to his own fraudulent and illegal activities."  (*Id.*)

The United States contends that "Section 505(b) of the Bankruptcy Code is not applicable to this matter" because it "vests the bankruptcy court with jurisdiction to determine the tax liability of the bankruptcy estate," and is "not applicable in this matter because the plaintiff is not seeking relief in the bankruptcy court and plaintiff is seeking a determination with regard to his personal tax liability for the year 2001."  (*Id.*)

**Peterson's Response**

Peterson responds that the terms of the Settlement Agreement relied upon by the United States "involved issues of taxation of earned income for the tax years 1990 through 1993," while

-9-

his current claim for "the 2001 tax year, involved totally different issues concerning a residual distribution from a receivership that might be subject to numerous alternative interpretations . . . ." (Memorandum of Taxpayer Opposed to IRS Motion for Summary Judgment, filed January 30, 2006 (dkt. no. 25) ("Peterson Opp. Mem."), at [2]-[3].)  "Since the Settlement was negotiated in 1994 and today in 2006, a twelve year period, there have been many very substantial changes to the applicable laws," Peterson argues, citing as an example "the Taxpayer Bill of Rights, 26 USC 7491." (*Id.* at [3].)  Concerning the Settlement Agreement's treatment of the Receiver's residual distribution, Peterson insists that "[t]he parties only agreed to 'report' future events."  (*Id.* at [4].) "They agreed that the taxpayer 'retains his legal rights to contest his tax liability,'" and that "his tax liability could not be known or determined until his tax return was filed."  (*Id.*)

Peterson offered no response to the Government's arguments concerning his lack of entitlement to or basis in the residual receivership assets or the inapplicability of 11 U.S.C. § 505(b) to determination of Peterson's tax liability based upon his individual Form 1040 return.

### PETERSON'S MOTION FOR SUMMARY JUDGMENT

In support of his own motion for summary judgment, Peterson asserts that the United States cannot rely upon the "tax benefit rule" to treat the Receiver's residual distribution as a recovery by Peterson of amounts earlier deducted by Peterson as part of his settlement of tax liabilities for the years 1990 through 1993.  (Memorandum in Support of Motion for Summary Judgement, filed December 15, 2005 (dkt. no. 19) ("Peterson Mem."), at [2]-[3].)

The United States responds that "the position of the United States in this case is not based on the tax benefit rule but is specifically supported by the provisions of the Settlement Agreement." (United States' Memorandum in Opposition to Plaintiff's Motion for Summary

Judgment, filed January 25, 2006 (dkt. no. 24), at 3.)

Peterson also asserts that 11 U.S.C. § 505 applies to discharge any tax liability for 2001 because of the failure of the Internal Revenue Service to respond to his request as "debtor-in-possession of his bankruptcy estate" for prompt determination of tax liability under § 505(b): "the Service has defaulted on its 60 day deadline to start audit, defaulted on its 180 day deadline to complete audit and claim a tax," and "defaulted on the three year statute of limitations to assess a tax" in accordance with § 505 practice.  (Peterson Mem. at 5-6.)  The United States responds that the Settlement Agreement provides that "the amount of the residual distribution shall be taxable to Jay Peterson individually," not to his bankruptcy estate, so § 505(b) does not apply.  (United States' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, filed January 25, 2006 (dkt. no. 24), at 4.)

In reply, Peterson argues that "[i]t was grossly illegal, probably even criminal, for the IRS to draft the Settlement terms so as to return this huge $768,960 asset, the residual distribution, directly to a debtor personally before it was subject to any of the preferential claims of the creditors in bankruptcy.  No judge would approve such a scofflaw provision."  (Reply by Taxpayer to Response of IRS re Cross Motions for Summary Judgment," filed February 22, 2006 (dkt. no. 27) ("Peterson Reply"), at [4].)  "It should be noted," Peterson continues, "that this illegal clause in a Settlement Contract is not enforceable, *had not Judge Boulden changed it*."  (*Id.* (emphasis added).)

In the bankruptcy court's order approving Peterson's Settlement Agreement, that court provided that "'[a]ny fund or property to be transferred or abandoned to Jay H. Peterson in accordance with paragraph 9 of the 'Final' Settlement Agreement shall be transferred or

abandoned to Peterson as a debtor-in-possession as a fiduciary for the Peterson estate."
(Amended Order Approving ["Final"] Settlement Agreement with Federal Trade Commission,
Internal Revenue Service, and Utah State Tax Commission, filed August 24, 1995 (dkt. no. 87),
*In re Jay H. Peterson*, No. 93B-26457 (Bankr. D. Utah), at 6 ¶ 9.)  Peterson apparently built the
anticipated residual distribution into his second amended Chapter 11 plan, deeming the
"Effective Date" of the Plan to be "the next Business Day following ten (10) days after the
Litigation Distribution is paid by the Receiver in the Litigation to the Debtor's Estate as a result
of the consummation of the Settlement Agreement . . . ."  ("Debtor's Second Amended Plan of
Reorganization, dated September 11, 1995, *In re Jay H. Peterson*, No. 93B-26457 (Bankr. D.
Utah), at 5 art. 1.31.)

    Pursuant to Peterson's second amended Chapter 11 Plan, the Receiver's disbursement to
Peterson as debtor-in possession was applied to pay allowed claims and administrative expenses
in the bankruptcy proceeding and the remaining funds, exceeding $300,000, were then remitted
to Peterson individually.[4]

    Assuming for purposes of the parties' cross-motions that Peterson is correct that the "tax
benefit rule" does not apply to the Receiver's residual distribution, and that the United States is
correct that its position in this case in not based on the tax benefit rule, then there is no current
controversy on that issue, and this court need only address the two remaining grounds pleaded by
Peterson and asserted in his moving papers.

---

    [4](*See* "Debtor's Second Amended Plan of Reorganization, dated September 11, 1995, *In re Jay H. Peterson*,
No. 93B-26457 (Bankr. D. Utah), at 29 art. 9.3.1.2., 31 arts. 10.5, 10.6.)

**Peterson Has Abandoned His Claim that Receiver's Residual Distribution
was not Taxable Income**

As summarized above, Peterson's Complaint alleged that the Receiver's residual
distribution of $768,960 to Peterson in 2001 was not "income," but was actually a return of his
own individual property.  (*See* Complaint at 4-5 ¶¶ 8(a), 9(a).)  Peterson did not press this theory
in his own motion for summary judgment, and in response to the United States' motion, Peterson
argued that "this residual distribution is subject to several possible alternative interpretations *as
various types of income*, such as excluded income, exempt income, capital gains income, income
offset by deductions, or previously taxed income," with *no* suggestion that the distribution was a
return of property and thus not "income" at all.  (Peterson Opp. Mem.at [3].)  At the February
23rd hearing, Peterson repeatedly acknowledged that the Receiver's residual distribution of
$768,960 was "taxable income," and he advanced no argument that it was actually a return of his
own property, and thus was not "income."  (Transcript of Hearing, dated February 23, 2006 ("Tr.
2/23/06"), at 30:6-12 ("yeah, that's right it's taxable income" (Mr. Peterson)); 52:15-19; 67:9-11;
71:9-10.)

Peterson, acting with the assistance of counsel, executed his Settlement Agreement in the
FTC action, expressly stipulating that the Receiver's residual distribution "shall be taxable to Jay
Peterson individually."  (Settlement Agreement at 21 ¶ 9.3.)  As noted above, that Settlement
Agreement was approved by both the district court and the bankruptcy court, and the anticipated
distribution formed the basis for funding Peterson's second amended Chapter 11 Plan, which was
approved on that basis by the bankruptcy court.

From the arguments advanced by Peterson in his papers and in open court, it appears that

he has abandoned his "return of assets" theory, and wisely so.  Peterson admitted in open court

and on the record that "I am bound by it," referring to the Settlement Agreement, (Tr. 2/23/06, at

75:19-20 (Mr. Peterson)), and he confirmed more than once that he is not attacking the

Settlement Agreement in this proceeding.  (*Id.* at 24:20-24, 56:13-16 (Mr. Peterson).)  This court

agrees that Peterson remains bound by the terms of his court-approved and court-adopted

Settlement Agreement, and any eleventh-hour attempt to re-characterize the residual distribution

contrary to the terms of that agreement would be to no avail.

### 11 U.S.C. § 505 Does Not Preclude the United States from Assessing Income Tax Liability Against Peterson Arising out of the 2001 Residual Distribution or Contesting Peterson's Refund Claim in this Proceeding

Section 505(b) provides that a trustee (and by extension a Chapter 11 debtor-in-

possession[5]) "may request a determination of *any unpaid liability of the estate for any tax*

*incurred during the administration of the case* by submitting a tax return for such tax and a

request for such a determination to the governmental unit charged with responsibility for

collection or determination of such tax."  11 U.S.C.A. § 505(b) (2004) (emphasis added).[6]

Under the terms of the Settlement Agreement, signed by Peterson and his counsel,

approved by both the bankruptcy court and the district court and adopted as an order by the

district court, "all such Residual Distributions shall be taxable to Jay Peterson individually."  (*Id.*

---

[5] *See* 11 U.S.C. § 1107(a) ("[A] debtor  in  possession shall have all the rights of a trustee.")

[6] The Legislative Statements accompanying the enactment of § 505 explain that "[t]he House amendment (sec. 505 (b)), adopts the provision of the House bill allowing the trustee discretion in all cases whether to ask the Internal Revenue Service, or State or local tax authority for a prompt audit of his returns *on behalf of the estate.*"  Statements by Legislative Leaders, *in* 1984 U.S. Code Cong. & Admin. News 576 (emphasis added).  *Cf. State of Illinois Dept. of Revenue v. Schechter*, 195 B.R. 380, 383 n.1 (N.D. Ill. 1996) ("11 U.S.C. § 505(b) . . . gives the trustee the right to request a determination of any unpaid liability of the estate for any tax incurred during the administration of the estate. Schechter concedes that it does not apply because his suit does not seek a determination of the tax liability of the estate but instead his own liability for the taxes.")

at 21 ¶ 9.3.)  While the disbursement of the funds was channeled through Peterson as debtor-in-possession, (*see* Tr. 2/23/06, at 73:1-74:1), because the Receiver's residual distribution served as the basis for Peterson's second amended Chapter 11 Plan, the bankruptcy court did not alter the terms of Paragraph 9.3 attributing the residual distribution to Peterson *individually* for tax purposes, in contrast to Peterson's Chapter 11 estate.[7]  Nor did the bankruptcy court alter Paragraph 9.4's requirement that "[t]he amount of any Residual Distribution, prior to reduction for the withholding of taxes pursuant to section 9.4, shall be reported on the . . . returns of Jay Peterson, who retains the rights provided by law to contest *his* income tax liability," not any "unpaid liability of the estate" under § 505(b).  (Settlement Agreement at 22 ¶ 9.4 (emphasis added).)

Peterson's bankruptcy estate did not pay any estimated federal or state income tax on the residual distribution in 2001; the Receiver *did*, making payments directly to the taxing authorities as directed by Paragraph 9.4, all of which was to be taxable to Peterson individually and reported on his federal and state returns.  Yet Peterson says that he filed individual (Form 1040) and bankruptcy estate (Form 1041) returns for 2001, *both* of which requested the full refund of the $343,936 withheld by the Receiver from the residual distribution.  If so, Peterson's request for a refund for 2001 made as debtor-in-possession on behalf of his bankruptcy estate (Form 1041) would be seeking the return of estimated tax payments for 2001 that his bankruptcy estate did *not* pay.

---

[7]The bankruptcy court's order approving the Settlement Agreement did *not* provide "that this is taxable income to actually the bankruptcy estate," as Peterson once asserted.  (Tr. 2/23/06, at 6:4-5.)  The Receiver's residual distribution was not laundered through Peterson's Chapter 11 Plan to free it from its tax consequences under Paragraphs 9-9.4 of the Settlement Agreement.  If Peterson's second amended Chapter 11 Plan was intended to avoid or reject the Settlement Agreement's tax treatment of the residual distribution, then the debtor-in-possession and his Plan should have made that purpose explicit.

As Peterson reaffirmed at the February 23rd hearing, "if its taxable to anyone, it's taxable to me." (Tr. 2/23/06, at 15:19-10 (Mr. Peterson).[8])  At the hearing, Peterson acknowledged his individual receipt from his bankruptcy estate of over $300,000 of the Receiver's residual distribution after the full payment of administrative expenses and allowed claims pursuant to his Chapter 11 Plan.  (*Id.* at 15:6-11; *see id.* at 7:3-8; 7:20-22; 8:2-5; 9:25-10:10; 12:12-13; 13:12-14; 45:18-46:1; *see also id.* at 64:11-14 (Ms. Lowe).)[9]  In that respect, the Settlement Agreement's attribution of the residual distribution as individual taxable income to Peterson substantially reflected the economic reality of the transaction.  (*See also* Tr. 2/23/06, at 53:15-17

---

[8]The colloquy on this point seems very clear:

> THE COURT:  Okay.  Now under that agreement that you and it looks like half the world signed, the proceeds were to be considered income to you personally?

> MR. PETERSON: Uh, more or less.

> THE COURT: Well that's what it says.

> MR. PETERSON: Well, it says taxable income.  You know so, so I mean we can agree that, that I'm, that, you know, *I or the estate are receiving that income and then if it's taxable to anyone it's taxable to me.*  There's big issues in here as to whether or not the corporations or Sandra Lopez could have been taxable for this.  We went round and round on that and so --

> THE COURT: Well but somebody ended up --

> MR. PETERSON: Yeah, somebody ended up, that was me.

> THE COURT: -- with an agreement?

> MR. PETERSON: Yeah.  So I agree that, you know, that *that money is taxable to me if anyone* and when you receive it I guess you call that income but if you look at the tax laws that doesn't tell you how much to tax or what theory.  You know, taxable [only] means capable of being taxed.

(Tr. 2/23/06. At 15:12-16:7 (emphasis added).)

[9]As part of the Receiver's residual distribution under the terms of the Settlement Agreement, the Receiver "abandoned"—that is, made a transfer to Peterson of—an asset of the receivership estate referred to as the "Kaleidoscope Home" having an agreed value of $250,000.  (Settlement Agreement at 20-21 ¶¶ 9-9.3.)  The Settlement Agreement provided that this portion of the residual distribution to Peterson would be *tax-free.*  (*Id.*)
During the administration of the receivership, Peterson retained possession of the Kaleidoscope Home, the maintenance expenses of which were apparently borne by the receivership.

(Mr. Peterson) (explaining that "the various provisions of the plan provide that the, all remaining assets are, are the assets of Jay Peterson").[10])

Peterson's request for refund of the $343,936 in withheld tax payments from the full $768,960 amount of the residual distribution "taxable to Jay Peterson individually" under Paragraph 9.3 of the Settlement Agreement falls well beyond the scope of any § 505(b) request for prompt determination of any "unpaid liability of the estate for any tax incurred during the administration of the case" in 2001.  (*See* Tr. 2/23/06, at 74:5-75:11.)  Section 505(b)'s discharge provisions find no application here, where the question of refund of part or all of the $343,936 turns on Peterson's individual tax liability for taxable income attributed to him—not on the question whether Peterson would somehow be held personally liable as the debtor (or debtor-in-possession) for any unpaid liability of his bankruptcy estate after its termination—a core concern addressed by the discharge provisions of § 505(b).  *See, e.g.*, *In re Southwestern States Marketing Corp.*, 179 B.R. 813, 816 (N.D. Tex. 1994) (§ 505(b)'s "purpose 'is to protect the trustee from personal liability for a tax falling on the estate that is not assessed until after the case is closed.'  *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6312.  Section 505(b) makes no mention of, and has no applicability to,

---

[10]The residue of Peterson's bankruptcy estate became Peterson's individual property:

THE COURT: . . . you're not asserting anything other than your personal interest and the fact that you may have acquired something residually but you don't claim to be any kind of assignee of the bankruptcy estate?

MR. PETERSON: No, not really, no.

THE COURT:  Okay.  So we're talking about Peterson personally?

MR. PETERSON:  Yes.

(*Id.* at 54:14-24.)

refund claims, which is what is at issue in this case.").

At the conclusion of the February 23rd hearing, Peterson acknowledged that he signed the Settlement Agreement, and he represented to the court that he does not dispute either the existence or the validity of the Settlement Agreement, that he remains bound by it, and that if anyone is taxable for the Receiver's residual distribution, it is Peterson himself. (Tr. 2/23/06, at 5:19-23; 23:20-25; 56:13-20; 75:12-20.) This court agreed with that view, (*id.* at 75:21-23), which likewise finds reflection in the United States' motion for summary judgment.

Section 505 does not operate to excuse Peterson from the force and effect of the Settlement Agreement or its specific terms governing the tax treatment of the Receiver's residual distribution to Peterson—tax treatment approved by the bankruptcy court and approved and adopted as an order by the district court.[11]

### This Court Made No Ruling as to Peterson's Claimed Deductions and His "Rights Provided by Law to Contest His Income Tax Liability" Under Paragraph 9.4 of the Settlement Agreement

At the conclusion of the February 23rd hearing, Peterson asked whether this court was ruling on the deductions claimed by him in the tax return documents he submitted to the Internal Revenue Service in April of 2002 and again in October of 2003. (*See* Tr. 2/23/06, at 77:22-23; 78:12-13.)

As indicated in open court, this court did not rule on the validity of any of Peterson's

---

[11]*Green v. Commissioner, I.R.S.*, 99-2 USTC ¶ 50,999, 84 A.F.T.R.2d 99-7118, 201 F.3d 447 (Table) (10th Cir. 1999), lends Peterson no aid as to the legal effect of his Settlement Agreement. *Green* involved the question whether a settlement agreement's tax treatment under the personal injury exclusion in one tax year (1990) precluded differing tax treatment of other amounts received in subsequent tax years (1991-1995), beyond the scope of the original settlement agreement. Here, the tax treatment of the 2001 residual distribution is directly governed by Paragraphs 9-9.4 of Peterson's Settlement Agreement, by which he is bound.

Moreover, *Green* is an unpublished disposition, having no binding precedential effect in this Circuit. *See* Tenth Cir. R. 36.3.

claimed deductions.  (*See id.* at 77:22-24; 78:11-15.)

Those deductions are simply not before this court.

Neither Peterson's Complaint nor his own motion for summary judgment raised the question of deductions or requested a refund of all or part of the $343,936 at issue based upon the adjustment of his tax liability for 2001 to account for valid and lawful deductions or credits.  (*See id.* at 77:16-21 (the Court) (noting that "[y]our pleadings as filed . . . as you review those, the footing for the complaint is a different footing than what you now suggest").)

At the February 23rd hearing, Peterson referred to Paragraph 9.4 of the Settlement Agreement, under which he "retains the rights provided by law to contest his income tax liability,"  (Settlement Agreement at 22 ¶ 9.4),[12] and upon inquiry by the court, he offered a brief summary of his claimed deductions.  (*See* Tr. 2/23/06, at 19:2-14; 20:18-21:1; 23:7-21; 24:1-10; 30:22-44:24.)  But in doing so, Peterson conceded that some of those deductions were in fact doubtful,[13] or even invalid.[14]  As he conceded, "the longer down the list I go the more difficult the legal justification is for these expenses."  (*Id.* at 35:23-24 (Mr. Peterson); *see id.* at 56:21-57:1 (same).)   He also acknowledged that he had said "all kinds of things" in his "extremely complicated tax return" because "you're supposed to give all your alternative theories . . . ."  (Tr.

---

[12]According to the United States, the Settlement Agreement contemplated that Peterson's individual tax liability for the $768,960 residual distribution would be adjusted based upon deductions claimed in his return.  (Tr. 2/23/06, at 66:21-67:4 (Ms. Lowe).)

[13]Among others, Peterson claims a $4,000,000 deduction for the payment of claims and expenses by the Receiver from the assets of the receivership estate—many of which were the allowed claims of consumers who ostensibly had been defrauded by Peterson in making purchases from his various businesses.  (Tr. 2/23/06, at 37:22-39:24.)  To claim such a deduction, it would seem Peterson necessarily would have to assert a basis of at least $4,000,000 in the proceeds of consumer fraud—a doubtful legal proposition at best.

[14](*See* Tr. 2/23/06, at 44:6-9 (Mr. Peterson) ("Number 10 was a business that I had started and then, you know, it kind of, it didn't go anywhere so I no longer believe that that would be an allowable deduction.").)

-19-

2/23/06, at 26:17-18; 27:18-20.)[15]

The validity and effect of Peterson's claimed deductions were not raised by either of the cross-motions for summary judgment.  The parties' written submissions afford no sufficient evidentiary basis from which this court could possibly evaluate Peterson's claimed deductions, *e.g.*, whether he and his wife actually donated $100,000 in personal property to Deseret Industries in 2001.  (*See* Tr. 2/23/06, at 40:18-42:8.)

Whatever the merits of Peterson's claimed deductions may be, the dismissal of this action does not purport to decide their validity for the simple reason that they are not here.

**CONCLUSION**

As Peterson acknowledges, he signed, is bound by and does not challenge his Settlement Agreement in the FTC action, which was approved by the bankruptcy court in Peterson's Chapter 11 proceeding and was approved and adopted as an order by the district court.  Under the terms of that Agreement, Peterson concedes that the Receiver's residual distribution of $768,960 in 2001 was income taxable to him individually and that he was required to report the same on his individual income tax return for 2001.  Of that $768,960, the Receiver withheld estimated federal taxes in the amount of 343,936, which the Receiver paid directly to the Internal Revenue Service pursuant to the terms of the Settlement Agreement.

The grounds asserted by Peterson for his refund claim in this action are few, and are very specific.  He has since abandoned his assertion that the Receiver's residual distribution of $768,960 was not income taxable to him because it was a return of his assets.  For the reasons explained above, Peterson's assertion that he is now entitled to a full refund of the $343,936

---

[15]In Peterson's own words, "it's kind of mind boggling."  (Tr. 2/23/06, at 26:21-22.)

-20-

withheld by the Receiver and paid to the IRS because of the preclusive effect of 11 U.S.C. §
505(b) in discharging any personal liability on his part for unpaid taxes of his bankruptcy estate,
lacks merit.  Neither the bankruptcy court's order approving the Settlement Agreement nor
Peterson's second amended Chapter 11 Plan altered the Settlement Agreement's treatment of the
Receiver's residual distribution of $768,960 for tax purposes.

As Peterson explained it, the portion of the residual distribution remitted to Peterson as
debtor-in-possession in 2001 was applied to make full payment of all allowed claims and
expenses of his bankruptcy estate pursuant to his Chapter 11 Plan, thereby effectively terminating
the administration of the Plan, and the balance—over $300,000 in cash—reverted to Peterson as
an individual, entirely consistent with the terms of the Settlement Agreement specifying that the
Receiver's residual distribution "shall be taxable to Jay Peterson individually."  (Settlement
Agreement at 21 ¶ 9.3.)

Peterson remains bound by the terms of his Settlement Agreement, including its treatment
of the Receiver's residual distribution for tax purposes.  (*See id.* at 20-22 ¶¶ 9-9.4.)  The United
States is correct that Peterson is precluded from claiming a refund of estimated taxes withheld
from that residual distribution on grounds that are inconsistent with the terms of the Settlement
Agreement, including Peterson's assertion in this case that his tax liability arising from the
residual distribution was discharged pursuant to 11 U.S.C. § 505(b), notwithstanding the terms of
the Settlement Agreement governing the tax treatment of that distribution.  On that basis, the
United States' motion for summary judgment must be granted, and Peterson's motion for
summary judgment must be denied.

Under the terms of the Settlement Agreement, Peterson "retains the rights provided by

-21-

law to contest his income tax liability," (*id.* at 22 ¶ 9.4), by claiming valid deductions, tax credits, and the like, but he has not pleaded such a contest in this proceeding, and the questions of which deductions he may rightfully claim, what his net tax liability for 2001 may be, and whether he is entitled to a refund of part or all of the $343,936 *on that basis*, are not before this court in this proceeding.

Therefore,

**IT IS ORDERED** that the United States' Motion for Summary Judgment, filed November 30, 2005 (dkt. no. 15), is hereby GRANTED; and Peterson's Motion for Summary Judgement, filed December 15, 2005 (dkt. no. 19), is hereby DENIED.

As no further issues remain to be adjudicated, the above-entitled action shall be and hereby is DISMISSED.  Let Judgment be entered accordingly.

DATED this _____ day of May, 2006.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge

-22-